## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CHAVA RACHEL MARK**, individually and as parent
and natural guardian of TBM, RLM and EBM, minors;
**TBM**, minor, by her mother and natural guardian; **RLM**,
minor, by her mother and natural guardian;  **EBM**,
minor, by her mother and natural guardian; **NETANEL
MARK**; **ESTATE OF DAVID SHLOMO MARK**, by          Civ. No. 20-civ-_____
and through its administrator, Yisca Mark; **SHIRA
MARK HARIF; YEHOSHUA MARK; MIRYAM
MARK; ORIT MARK ETTINGER; PDAYA MARK,
AYELET BATT; ARYEH BATT; AVRAHAM
BATT;** and **ELISHEVA HIRSHFELD**,

                                    Plaintiffs,

        vs.

**THE REPUBLIC OF THE SUDAN**,

                                    Defendant.
_____/

## COMPLAINT

        Plaintiffs, by counsel, bring this action for damages against Defendant, the Republic of

the Sudan, and allege as follows:

## INTRODUCTION

        1.      This is a civil action brought pursuant to the "Terrorism Exception" to the Foreign

Sovereign Immunities Act, 28 U.S.C. § 1605A (the "FSIA"), seeking damages for wrongful

death, personal injury, and related torts, that resulted from a terrorist drive-by shooting attack

(the "Terrorist Attack" or the "Attack") carried out by Hamas – The Islamic Resistance

Movement (a/k/a "Harakat al-Muqawamah al-Islamiyya") ("Hamas"), an entity designated by

the United States government as a Specially Designated Terrorist ("SDT"), a Foreign Terrorist

Organization ("FTO"), and a Specially Designated Global Terrorist ("SDGT").

2.      On Friday, July 1, 2016, Rabbi Michael "Miki" Mark was driving with his wife, Chava, and two of their children on a quiet country highway in Israel when two Hamas gunmen overtook their car and sprayed machine gun fire at the Mark family. Rabbi Mark was killed in the attack. His wife, Chava, was critically wounded and continues to suffer from permanent brain injuries and the loss of one eye.

3.      The two Mark children who were accompanying their parents were also injured in the shooting. Their minor daughter, TBM, suffered gun shot wounds to her stomach, and their son, Pdaya, was injured in the ensuing crash.

4.      Defendant, the Republic of the Sudan ("Sudan"), provided Hamas with material support and resources, authorized and ratified the actions of its officers, employees and agents described herein, and took other actions that facilitated, enabled, and caused the Terrorist Attack.

5.      This action is brought by Rabbi Mark's widow, Chava Mark, who was, herself, grievously injured in the Attack; Michael and Chava Marks' nine surviving children, including the two who were also injured in the Attack; the estate of the Marks' son, David Shlomo Mark, who died in a traffic accident in 2019; and the mother, brothers, and sister of Chava Mark. All of the plaintiffs suffered serious physical and/or emotional injuries as a result of the Attack, the death of Rabbi Mark, and the serious, permanent injuries suffered by Chava Mark, Pdaya Mark, and TBM.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter and over the defendant pursuant to 28 U.S.C. §§ 1330, 1331, 1367 and 1605A.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(f).

## THE PARTIES

8.      Plaintiff, Chava Mark sustained severe, permanent, life-altering head and brain injuries in the Attack. She also suffered and continues to suffer the loss of her husband and father of her ten children. Chava Mark is a United States national.

9.      Plaintiff, Chava Mark brings this action individually and as parent and natural guardian of her minor children, TBM, RLM, and EBM.

10.     The Marks' son Pedaya, who was a minor at the time of the Attack, and their daughter, TBM, also a minor at the time of the Attack and still today, were riding in the car with their parents. Both witnessed their father's murder and saw their mother critically injured in the Attack.

11.     TBM sustained gun shot wounds to her stomach, and Pedaya was injured when the family's car overturned and crashed after the shooting.

12.     Plaintiff, Pedaya Mark is a United States national. He is a son of Michael and Chava Mark and a sibling of TBM.

13.     Plaintiff, TBM is a United States national. She is a daughter of Michael and Chava Mark and a sibling of Pdaya Mark.

14.     Plaintiff, RLM is a minor child of Michael and Chava Mark and a sibling of Pdaya Mark and TBM. She is a United States national.

15.     Plaintiff EBM is a minor child of Michael and Chava Mark and a sibling of Pdaya Mark and TBM. She is a United States national.

16.     Plaintiff Netanel Mark is a United States national. He is a son of Michael and Chava Mark and a sibling of Pdaya Mark and TBM.

17.     Plaintiff Yehoshua Mark is a United States national. He is a son of Michael and Chava Mark and a sibling of Pdaya Mark and TBM.

18.     Plaintiff Shira Mark Harif is a United States national. She is a daughter of Michael and Chava Mark and a sibling of Pdaya Mark and TBM.

19.     Plaintiff Miryam Mark is a United States national. She is a daughter of Michael and Chava Mark and a sibling of Pdaya Mark and TBM.

20.     Plaintiff Orit Mark Ettinger is a United States national. She is a daughter of Michael and Chava Mark and a sibling of Pdaya Mark and TBM.

21.     David Shlomo Mark was a son of Michael and Chava Mark and a sibling of Pdaya Mark and TBM. He tragically died in a traffic accident in 2019. David Shlomo Mark was a United States national.

22.     Plaintiff the Estate of David Shlomo Mark brings this action through Yisca Mark, the widow of David Shlomo Mark and the administrator of the Estate of David Shlomo Mark.

23.     All of the Mark children suffered and continue to suffer from the loss of their father and the severe, incapacitating, and permanent injuries sustained by their mother, and the injuries suffered by Pdaya Mark and TBM, their brother and sister, respectively.

24.     Plaintiff, Ayelet Batt is the mother of Chava Mark and grandmother of all of the Mark children. She is a United States national.

25.     Plaintiff, Aryeh Batt is a brother of Chava Mark. He is a United States national.

26.     Plaintiff, Avraham Batt is a brother of Chava Mark. He is a United States national.

27.     Plaintiff, Elisheva Hirshfeld is the sister of Chava Mark. She is a United States national.

28.     Plaintiffs Ayelet Batt, Aryeh Batt, Avraham Batt, and Elisheva Hirshfeld suffered

and continue to suffer from the severe, incapacitating, and permanent injuries sustained by their

daughter and sister, Chava Mark.

29.     Defendant the Republic of the Sudan is, and at all times relevant hereto was, a

foreign state within the meaning of 28 U.S.C. § 1603, designated as a state sponsor of terrorism

pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)). Sudan

provided material support and resources for the commission of acts of extrajudicial killing,

within the meaning of 28 U.S.C. § 1605A, including the Terrorist Attack, authorized and ratified

the actions of its officers, employees and agents described herein, and performed other actions

that facilitated, enabled, and caused the Terrorist Attack and the harm to the plaintiffs herein.

## STATEMENT OF FACTS

### A.  Hamas is a radical terrorist organization that publicly and proudly executes terrorist attacks against civilians.

30.     Hamas is a radical terrorist organization that openly declares its goals of creating

an Islamic state covering the entire territory of Israel, the West Bank and the Gaza Strip, as well

as the destruction of the State of Israel and the murder or expulsion of its Jewish residents.

Hamas seeks to achieve these goals by carrying out terrorist attacks against Jewish civilians in

Israel, the West Bank and the Gaza Strip. Hamas proudly and openly acknowledges that it uses

terrorism to achieve its political goals. Hamas uses terrorism to coerce, intimidate and influence

the Israeli government and public and thereby bring about the eventual eradication of the State of

Israel, its replacement with an Arab state, and the murder and/or expulsion of the Jewish

residents of the State of Israel.

31.     Hamas' official charter calls for the annihilation of the State of Israel and the

creation of an Islamic state in the territory comprising Israel, the West Bank and the Gaza Strip.

Since its founding, Hamas has sought to achieve this goal by using terrorist violence to weaken, undermine and demoralize the State of Israel, and Israel's population, institutions, and econo-my. Hamas' founding charter explicitly provides that the "usurpation of Palestine by the Jews" should be reversed through a "holy war" and the use of violence

32.     Continuously since 1995, and at all times relevant to this litigation, Hamas has been designated by the United States as a Specially Designated Terrorist ("SDT"). Continuously since 1997 and at all times relevant to this litigation, Hamas has been listed by the United States Department of State as a Foreign Terrorist organization ("FTO")[1]. Continuously since 2001, and at all times relevant to this litigation, Hamas has been listed pursuant to Executive Order No. 13224 as a Specially Designated Global Terrorist ("SDGT")[2].

33.     At all relevant times, Hamas has carried out terrorist attacks through its military wing, known as the Izz A-Din Al-Qassam Brigades ("Al-Qassam Brigades").

34.     Hamas's practice of carrying out terrorist attacks like the Terrorist Attack, and its multiple designations as a terrorist organization, were and are well known to the public at large, including the Defendant Sudan. With knowledge of Hamas's terrorist goals and with the deliberate intent to further those goals, Sudan provided material support to Hamas for use in terrorist attacks including the Attack upon the Mark family. Sudan's active role in Hamas terrorism is further detailed below.

**B.   Hamas Operatives Prepared for the Attack.**

35.     In March or April of 2016, Hamas operative, Muhammed Jbara Fakia ("Fakia") approached fellow Hamas operative Muhammed al-Amarya ("al-Amarya") and enlisted his assistance acquiring weapons for use in terrorist attacks against Israelis.

---

[1] See https://www.state.gov/j/ct/rls/other/des/123085.htm last visited February 6, 2020.
[2] See https://www.treasury.gov/ofac/downloads/sdnlist.pdf, last visited February 6, 2020.

36.    According to Israeli intelligence and law enforcement records, Fakia had previously been a member of Palestinian Islamic Jihad, another Sudan-sponsored designated terrorist group. However, while serving time in an Israeli prison for prior terrorist activities, Fakia left the PIJ and joined Hamas.

37.    Al-Amarya had previously been convicted by the Israelis in 2008 for illegally trading in military weapons, discharging weapons towards a person, and for membership in a terrorist organization. He was released from prison in 2011 pursuant to a prisoner exchange deal between Israel and Hamas.

38.    Fakia and al-Amarya both lived in the town of Dura, near Hebron.

39.    Al-Amarya purchased a Kalashnikov assault rifle and bullets for 38,000 New Israeli Shekels, which was the equivalent of slightly more than $10,000. Fakia and al-Amarya began training with the weapon and another that Fakia had already acquired.

40.    In May 2016, Fakia told his brother Sahib, who was also a member of Hamas, about his plans to carry out an attack against Israeli civilians. Sahib assisted Fakia by purchasing elbow and knee pads, face masks, and two military uniforms. Fakia told Sahib that he had amassed an arsenal of nine firearms and five Kalashnikov magazines, fully loaded with bullets.

41.    At around the same time, Fakia approached Ala'ah Ra'ad Salah Zagayer ("Zagayer"), and requested that Zagayer acquire a video camera, films of Hamas leaders, Hamas flags, and two military uniforms. Zagayer later stated that he understood that Fakia was planning a terrorist attack and wanted to film his last will before the operation. Zagayer helped Fakia obtain the requested items.

42.    Fakia owned a car – a Hyundai. However, he wanted to use a different car in the Attack – one that would be more difficult to trace. Accompanied by Zagayer, Fakia purchased an Opel.

43.    Approximately three weeks before the Attack, Fakia told Zagayer, that Fakia's superiors instructed him to find someone to replace him in the organization following his death. Zagayer recommended a friend of his, but Fakia said he preferred a different candidate.

44.    Shortly thereafter, Fakia told his brother, Sahib, that he was ready to carry out the Attack. However, Fakia received orders from leaders of Hamas's military wing, the Izz ad-Din al-Qassam Brigades, directing him to postpone the Attack due to an expected flare-up with Israel in Gaza.

45.    Fakia requested that his brother hide the weapons. The brothers disassembled the guns and cleaned them. Sahib kept them in his house at night, and Fakia took them out during the day.

46.    While Fakia and al-Amarya waited for instructions from Hamas leadership to proceed with the attack, they continued their training and intelligence gathering.

47.    Fakia would dress in an Israeli army uniform while another person, dressed as an Israeli settler. In these disguises the two were able to move about freely in areas under Israeli control and search for an appropriate location for their planned Attack.

48.    Approximately one week before the Attack, Fakia asked Zagayer to deliver a message for him. Fakia handed Zagayer a note and instructed him to go to the al-Kharas Mosque in Hebron. Zagayer was to remove his shoes (as is the Muslim custom before prayer), leave them on a particular shelf, and to place the note inside one of the shoes. Fakia told Zagayer that someone would collect the note from the shoe.

49.     Zagayer proceeded as instructed, but he forgot where he was supposed to place the note. When he returned with the note, Fakia told him he must return as people were waiting for the note.

50.     Zagayer again did as instructed. On the way, he read the note and saw that it said: "Surveillance has been performed on the target. The operation must be this Friday."

51.     Zagayer delivered the note as instructed and waited until another man removed the note from the shoe and placed a different note in the shoe.

52.     Zagayer took the second note with him and returned to Fakia. But before he delivered the note to Fakia, Zagayer read it. This note said: "We want to see you on Tuesday following the afternoon prayers at the *al Ahali* Mosque in Hebron."

53.     Zagayer understood that Fakia was planning to carry out an attack the following Friday.

54.     When Zagayer presented the return-note to Fakia, the latter read the note, tore it into pieces, and threw it out of the window.

55.     Approximately three days before the Attack, Fakia told his brother that due to the concern that the Israelis would arrest him before he would have a chance to carry out the Attack, Hamas officials had authorized him to proceed.

56.     Fakia asked Zagayer to arrange for him an apartment where Fakia could film his last will while dressed in a military uniform and standing next to Hamas flags.

57.     Fakia and al-Amarya attempted three times to carry out a drive-by shooting attack. However, they were unable to identify an appropriate target. Exhibiting discipline, they decided to bide their time.

58.     On July 1, 2016, Sahib saw Fakia dressed in black military style pants and army boots. Fakia told Sahib that he was going to carry out the Attack that day.

59.     Sahib escorted his brother to the car. Al-Amarya was driving Fakia's Hyundai. After the Attack, Fakia would tell Zagayer that he used the Hyundai because it could accelerate faster than the Opel he had purchased for use in the Attack.

60.     Fakia asked Sahib to bring him the elbow pads, which he did. Sahib also noticed that Fakia had obtained an Israeli license plate.

61.     Fakia and al-Almarya drove to a local school where they removed the Palestinian license plate and replaced it with the Israeli plate. Then they drove out of Dura looking for an appropriate target.

## C. **The Terrorist Attack**.

62.     On July 1, 2016, Rabbi Michael Mark, his wife, Chava, and two of their ten children were driving to Jerusalem to visit Rabbi Mark's mother.

63.     As they drove on the two-lane road, Fakia and al-Amarya followed them for a number of minutes. Al-Amarya was driving and Fakia was seated in the passenger seat.

64.     Fakia instructed al-Amarya to pull alongside the family's car. Al-Amarya veered into the left lane and accelerated until the Hamas car was next to the Mark's vehicle. Fakia opened fire with a Kalashnikov assault rifle, shooting at the Mark family from a distance of approximately 2 meters.

65.     In a matter of seconds, the Hamas terrorists fired approximately 25 bullets into the Marks' car. Five bullets stuck Rabbi Mark's body and one bullet penetrated his head.

66.     Michael Mark lost control of the car, which flipped on its top before coming to a crashing halt.

67.     Chava Mark also sustained bullet wounds to her head. When the car stopped moving, she was unconscious, still strapped into her seat, upside-down. Chava was critically injured and remained in a coma for several days, unable to attend her husband's funeral. Chava has undergone multiple brain surgeries and lost an eye as a result of her injuries. She continues to suffer from her permanent and serious injuries.

68.     The children, Pdaya and TBM were both injured, but remained conscious. TBM had been shot in the stomach. Pdaya was injured in the crash. The children saw their parents unresponsive and believed that they had both been killed in the shooting. The children could not extricate themselves from the car. They remained in the car, helpless; both injured, knowing their parents could not save them.

69.     The Hamas terrorists performed a U-turn and drove back to where the Marks' car had stopped. Al-Amarya would later confess that they wanted to ensure that all occupants of the car were dead.

70.     Fakia approached and fired again into the Marks' car. However, al-Amarya noticed that other vehicles were coming, and called for Fakia to quickly return to the car so they could escape.

71.     On their way back to Dura, Fakia told al-Amarya that upon his return to the victims' over-turned car he saw the two children alive in the back seat. The terrorists expressed their disappointment that they had to flee and were unable to kill the children.

72.     The Hamas operatives returned to the school and switched the car's license plate from the Israeli tag back to the Palestinian original. They threw the Israeli plate in the garbage.

73.     Fakia and al-Amarya each took one of the Kalashnikovs with them and they parted ways.

74.     At al-Amarya's trial, the Israeli court found that he had acquired the two Kalashnikovs and the bullets used in the attack. One of the weapons used in the attack was the one al-Amarya purchased for Fakia with 38,000 New Israeli Shekels. Al-Amarya and Fakia had trained with the weapons during the months leading up to the attack. Al-Amarya was convicted of premeditated murder, several counts of attempted murder, dealing in military equipment, and illegal possession of weapons.

75.     Immediately after the Attack, a Palestinian couple came upon the scene of the Marks' over-turned vehicle. They stopped to help the victims. The couple pulled the frightened and injured children from the car.

76.     The man stood by the road trying to flag down additional help, while his wife, who was a trained nurse, tended to the children.

77.     Within minutes a Palestinian doctor and his brother stopped to help as well. The doctor determined that Rabbi Mark was dead. But they pulled Mrs. Mark from the car. She had been choking due to the position of her seatbelt.

78.     Other Palestinians passed in their vehicles. Some of them threatened the heroic rescuers who continued to tend to the Mark family until an ambulance arrived and evacuated the victims to a hospital.

79.     Intelligence agencies and the Israeli army confirmed that the attack had been perpetrated by two Hamas cells. Following the Attack, Israeli intelligence discovered Hamas infrastructure in the West Bank that led them to the trigger-man, Fakia, who was hiding in a Palestinian village near Hebron.

80.    Israeli security officials captured the driver, al-Amarya, alive. He confessed to his role in the Attack and provided details thereof to the Israeli investigators. Al-Amarya was tried and convicted for his role in the Terrorist Attack.

81.    Three weeks after the Attack, Israeli forces surrounded the house in which Fakia was hiding. The Israeli forces called for Fakia's surrender, but the Hamas operative responded with gunfire and explosives. After a 7-hour stand-off, during which the Israeli security forces razed the house, Fakia's death was confirmed.

82.    Hamas was furious with the Palestinian Authority (the "PA") due to its refusal to prevent or otherwise interfere with the Israeli raid. Fakia's family, some of whom were also known members of Hamas, accused the PA of informing Israel of Fakia's location.

83.    Hamas praised Fakia as a hero and a martyr, and explicitly claimed credit for the "successful operation," meaning the Terrorist Attack on the Mark Family.

84.    In speeches and in writing, Hamas leaders individually praised Fakia as a hero and a martyr.

85.    Hamas-controlled radio stations, web sites, and other media similarly praised Fakia as a Hamas hero and martyr.

86.    Statements by Fakia's co-conspirators confirmed that leaders of the Hamas military wing, the Izz ad-Din al-Qassam Brigades had planned and ordered the Attack.

**D.  Sudan Shared Hamas's Goals and Supported its Terrorist Activities.**

87.    In June 1989, Colonel Omar al-Bashir initiated a military coup in Sudan and established an Islamic government which was deeply hostile to the United States and to Israel.

88.    Since August 12, 1993, until the present time, Sudan has been continuously designated by the United States Department of State as a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)).

89.    During all periods relevant to this suit, it has been the continuous and official policy of Sudan to use terrorism against the United States and its allies, including Israel, to advance its interests both domestically and abroad. By providing material support and resources to terrorist organizations, Sudan was able to enlist these terrorist proxies to carry out attacks against the United States and Israel, and advance Sudanese interests around the world.

90.    Towards these ends, Sudan has provided massive material support and resources to numerous anti-American and anti-Israel terrorist organizations, including Hamas, which shares Sudan's violently anti-American and anti-Israel ideology and goals.

**E.  Sudan Provided Material Support and Resources to Hamas**.

91.    The State Department designated Sudan as a State Sponsor of Terrorism in 1993 due to concerns about support to international terrorist groups, including the Abu Nidal Organization, Palestine Islamic Jihad, Hamas, and Hizballah[3].

92.    During the period relevant hereto, Sudan provided Hamas with material support and resources within the meaning of 28 U.S.C. § 1605A(a)(1), described below, with the specific intention of causing and facilitating the commission of acts of extrajudicial killing, including the Terrorist Attack. Such support was provided continuously, routinely and in furtherance and as implementation of a specific policy and practice established and maintained by Sudan, in order to assist Hamas achieve goals shared by Sudan.

---

[3] Country Reports on Terrorism 2016 at 305. https://www.state.gov/wp-content/uploads/2019/04/crt_2016.pdf

93.     Sudan provided the material support and resources detailed below pursuant to an agreement reached between Sudan and Hamas in the years prior to the Terrorist Attack. Under that agreement, Hamas undertook to carry out acts of extrajudicial killing and terrorism against Jews in Israel, and in return Sudan undertook to provide Hamas with material support and resources to carry out such extrajudicial killings and terrorist attacks.

94.     Sudan provided Hamas with the material support and resources detailed below through officials, employees, and agents of Sudan (hereinafter: "Officials and Agents").

95.     The material support and resources that were provided to Hamas by Sudan and its Officials and Agents in the years immediately prior to the Terrorist Attack for the purpose of facilitating acts of extrajudicial killing and terrorism included inter alia: provision of financial support to Hamas; provision of specialized and professional military training for the planning and execution of terrorist attacks (hereinafter: "terrorist training") to Hamas; providing use of training bases and military facilities in which terrorist training was provided to Hamas and its operatives; providing Hamas and its leaders and operatives safe haven and refuge from capture; providing Hamas means of electronic communication; providing Hamas with financial services, including banking and wire transfer services; and providing Hamas means of transportation.

96.     Sudan and its Officials and Agents gave substantial aid and assistance to Hamas, and provided the massive material support and resources described above to Hamas, and thereby aided and abetted Hamas, all with the specific intention of causing and facilitating the commission of acts of extrajudicial killing, including the Terrorist Attack. Sudan and its Officials and Agents did so with actual knowledge that Hamas had killed and injured U.S. citizens in terrorist attacks and that additional U.S. citizens and other persons would be killed and injured as a result of their aiding, abetting, and provision of material support and resources to Hamas.

15

97.    Sudan and its Officials and Agents knowingly and willingly conspired, agreed and acted in concert with Hamas, in pursuance of the common plan, design, agreement and goals discussed above, to cause and facilitate the commission of acts of extrajudicial killing, including the Terrorist Attack. Sudan and its Officials and Agents did so with actual knowledge that Hamas had killed and injured U.S. citizens and that additional U.S. citizens and other innocent civilians would be killed and injured as a result of their conspiracy with Hamas.

98.    At all relevant times, Sudan's Officials and Agents were officials, employees, and/or agents of Sudan, and performed actions on behalf of Sudan, in furtherance of the interests and policy of Sudan, and within the scope of their office, employment and agency, within the meaning of 28 U.S.C. §§ 1605A(a)(1) and 1605A(c), which caused the Terrorist Attack and harm to the plaintiffs herein, in that Sudan's Officials and Agents authorized, planned and caused the provision of funds, terrorist training and other material support and resources by Sudan to Hamas for the commission of acts of extrajudicial killing including the Terrorist Attack.

99.    Sudan authorized, ratified and approved the actions described herein of its Officials and Agents, and is therefore vicariously liable for those actions.

100.    Throughout al-Bashir's rule, Sudan provided training, material support, safe haven, and other logistical and strategic support for Hamas. Sudan provided training bases for Hamas, where its operatives studied bomb-making and received military training. Sudan also enabled Hamas and other terrorist organizations to stockpile weapons in its territory.

101.    Significantly Sudan provided Hamas with a critical weapons-supply route for the transfer of arms from Libya and Iran.

102.    In early 2009, Israel carried out a series of air strikes in Sudan in an effort to disrupt the supply chain of Iranian weapons bound for Hamas. The Israelis had learned that the

Iran-Sudan-Hamas access was attempting to ship 70-kilometer range Fajr-3 rockets to Hamas for use in attacks against Israel.

103.    In the following years, Israel carried out numerous additional airstrikes in an effort to disrupt the arms shipments and other support for Hamas.

104.    In 2011, Israel carried out an airstrike in Port Sudan upon the car of Hamas' Qassam Brigades leader, Abdul-latif Al-Ashqar. The Hamas terrorist survived the airstrike.

105.    In 2012, Reuters quoted Sudan's Second Vice President al-Haj Adam Youssef, who asserted that despite Israel's bombing of an arms factory in Khartoum, Sudan would continue to provide support for Hamas[4].

106.    Convoys of Iranian weapons for Hamas exploited the safe-haven provided by Sudan as they crossed into Egypt and Sinai on their way to Hamas in the Gaza Strip

107.    In 2014, the Israeli military interdicted the merchant cargo ship, Klos C, which was carrying Iranian rockets and other weapons to Sudan for shipment to Hamas in the Gaza Strip. The Israeli military explained that the ship was heading for Port Sudan, where Iran's Quds Force was to take possession of the rockets and move them on land to Egypt and then into the Gaza Strip through smuggling tunnels operated by and for Hamas.

108.    As recently as 2015 the State Department reported that members of Hamas were allowed to raise funds, travel, and live in Sudan. Also in 2015, Israel carried out an airstrike on a weapons facility in the Sudanese city of Omdurman.

109.    In 2016 al-Bashir cut ties with Iran in an attempt to obtain financial benefits from cooperation with Saudi Arabia and the United States. Nonetheless, Sudan continued to facilitate Hamas's weapon smuggling and to provide other material support.

---

[4] See *Sudan says supports Hamas despite Israel's "aggression,"* November 4, 2012, https://www.reuters.com/article/us-sudan-hamas-israel-idUSBRE8A30AS20121104

110.     Through at least 2019, Sudan continued to provide safe haven, local offices, and other forms of support for Hamas.

### FIRST COUNT
### ACTION FOR DAMAGES UNDER 28 U.S.C. § 1605A(c)

111.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

112.     Sudan is a foreign state that, since 1984, has continuously been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

113.     Sudan provided to Hamas material support and resources, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the Terrorist Attack.

114.     Sudan conspired with Hamas to carry out the Terrorist Attack.

115.     Sudan's Officials and Agents are officers, employees, and/or agents of Sudan, and they provided the material support and resources which caused and facilitated the Terrorist Attack, and conspired with Hamas to carry out the Terrorist Attack, all while acting within the scope of their office, employment, and agency.

116.     Hamas is, and was at the time of the Attack, an agent of Sudan, and it carried out the Terrorist Attack while acting within the scope of its agency.

117.     The Terrorist Attack was an extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

118.     Decedent Rabbi Michael Mark was murdered in the Terrorist Attack. The murder of Rabbi Mark caused plaintiffs Chava Mark, Netanel Mark, Pdaya Mark, TBM, RLM, EBM, Yehoshua Mark, Shira Mark Harif, Miryam Mark, Orit Mark, David Shlomo Mark, severe injury, including: pain and suffering; pecuniary loss and loss of income; loss of guidance,

companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

119.    Plaintiff Chava Mark was shot in the head and severely and permanently injured in the Attack. She was placed in extreme fear of immediate death or serious physical injury for herself, her husband, and her children Pdaya and TBM, who were also in the car. Chava Mark witnessed the terrorists murder her husband, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: bullet wounds, disfigurement, loss of physical and mental functions, and the loss of one eye. Chava Mark was required to undergo multiple surgeries and to endure extreme pain and emotional suffering, loss of guidance, companionship and society, loss of consortium, loss of solatium, and pecuniary loss and loss of income.

120.    Plaintiff Pdaya Mark was injured in the Attack and ensuing crash. He was placed in extreme fear of immediate death or serious physical injury for himself, his parents and his sister. Pdaya Mark witnessed his father's murder and his mother's and sister's grievous injuries. Plaintiff Pdaya Mark suffered severe harm as a result of the Terrorist Attack, including: severe emotional distress and mental anguish; loss of guidance, companionship and society; loss of consortium; and loss of solatium.

121.    Plaintiff TBM suffered gunshot wounds to her stomach and other injuries during the Attack. She was placed in extreme fear of immediate death or serious physical injury (for herself, her parents and her brother). TBM witnessed her and father's murder and her mother's grievous injuries. Plaintiff TBM suffered severe harm as a result of the Terrorist Attack, including: severe emotional distress and mental anguish; loss of guidance, companionship and society; loss of consortium; and loss of solatium.

122.    The death of Michael Mark and the injuries suffered by plaintiffs Chava Mark, Pdaya Mark, and TBM in the Terrorist Attack caused plaintiffs Chava Mark, Netanel Mark, Pdaya Mark, TBM, RLM, EBM, Yehoshua Mark, Shira Mark Harif, Miryam Mark, Orit Mark, David Shlomo Mark, severe harm, including: severe emotional distress and mental anguish; loss of guidance, companionship and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

123.    The injuries suffered by plaintiff Chava Mark in the Terrorist Attack caused plaintiffs Ayelet Batt, Aryeh Batt, Avraham Batt, and Elisheva Hirshfeld, severe harm, including: severe emotional distress and mental anguish; loss of guidance, companionship and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

124.    The murder of Rabbi Michael Mark and the harm and injuries suffered by the plaintiffs due to the Terrorist Attack were the direct and proximate result of Sudan's conduct described herein.

125.    Sudan is therefore liable for the full amount of plaintiffs' damages under 28 U.S.C. § 1605A(c), in such sums as may hereinafter be determined.

126.    Sudan's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

**WHEREFORE**, plaintiffs demand judgment as follows:

a.    Judgment against defendant Sudan for compensatory damages in an amount to be determined by the Court which is not less than $250,000,000 (two hundred fifty million dollars);

b.    Judgment against defendant Sudan for punitive damages in an amount to be determined by the Court;

c.    Plaintiffs' costs and expenses;

d.  Plaintiffs' attorneys' fees;

e.  Such further relief as the Court finds just and equitable.

October 20, 2020

                                      Plaintiffs, by their attorney,


                                        By: _/s/ Asher Perlin_____
                                        Asher Perlin
                                        LAW OFFICE OF ASHER PERLIN
                                        Bar I.D. FL0006
                                        4600 Sheridan Street, Suite 303
                                        Hollywood, Florida 33021
                                        786-233-7164
                                        asher@asherpelin.com