IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
CHAVA RACHEL MARK, *et al.*                )
                                                    )
            *Plaintiffs*,                          )
                                                    )
v.                                                  )            Civil Action No. 1:20-cv-3022-TNM
                                                    )
REPUBLIC OF THE SUDAN                     )
                                                    )
            *Defendant*.                           )
_____)

**UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF THE
CONSTITUTIONALITY OF THE SUDAN CLAIMS RESOLUTION ACT AND
THE SUDAN CLAIMS SETTLEMENT AGREEMENT AND
IN SUPPORT OF DISMISSAL OF THE COMPLAINT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................................ 1

LEGAL BACKGROUND ............................................................................................................ 2

    A.  The Foreign Sovereign Immunity Act ............................................................................ 2

    B.  The Doctrine of Espousal ................................................................................................ 3

FACTUAL BACKGROUND ....................................................................................................... 4

PROCEDURAL BACKGROUND ............................................................................................... 8

ARGUMENT ............................................................................................................................... 9

    I.   PLAINTIFFS' CONSTITUTIONAL OBJECTIONS TO THE CSA AND THE SCRA ARE MERITLESS. ......................................................................................................... 9

    II.  THE CSA AND THE SCRA REQUIRE DISMISSAL OF PLAINTIFFS' CLAIMS. ...... 19

CONCLUSION .......................................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**

*Am. Bus. Ass'n v. Rogoff*,
    649 F.3d 734 (D.C. Cir. 2011) .................................................................. 10

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003) ............................................................................ 3, 16

*Antolok v. United States*,
    873 F.2d 369 (D.C. Cir. 1989) .................................................................... 3

*Asociacion de Reclamantes v. United Mexican States*,
    735 F.2d 1517 (D.C. Cir. 1984) .............................................................. 3, 19

*Aviation & Gen. Ins. Co. v. United States*,
    882 F.3d 1088 (Fed Cir. 2018) .................................................................. 16

*Bank Markazi v. Peterson*,
    136 S. Ct. 1310 (2016) ................................................................... *passim*

*Belk v. United States*,
    858 F.2d 706 (Fed. Cir. 1988) .................................................................. 16

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985) ............................................................................... 10

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) .............................................................. 4, 13, 16, 19

*FCC v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993) .......................................................................... 10, 11

*Flanagan v. Islamic Republic of Iran*,
    87 F. Supp. 3d 93 (D.D.C. 2015) .............................................................. 12

*Guar. Trust Co. v. United States*,
    304 U.S. 126 (1938) ................................................................................. 4

*Hettinga v. United States*,
    677 F.3d 471 (D.C. Cir. 2012) .................................................................. 10

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994) ............................................................................... 20

*Lehnhausen v. Lake Shore Auto Parts Co.*,
    410 U.S. 356 (1973) ............................................................................... 11

*OBB Personenverkehr AG v. Sachs,*
  577 U.S. 27 (2015) ............................................................................................ 2

*Owens v. Republic of Sudan,*
  826 F. Supp. 2d 128 (D.D.C. 2011) ................................................................. 12

*Republic of Iraq v. Beaty,*
  556 U.S. 848 (2009) ............................................................................. 2, 14, 18

*Republic of Mexico v. Hoffman,*
  324 U.S. 30 (1945) ........................................................................................... 18

*Rux v. Republic of Sudan,*
  495 F. Supp. 2d 541 (E.D. Va. 2007) .............................................................. 13

*Silver v. Silver,*
  280 U.S. 117 (1929) ......................................................................................... 18

*United States v. Pink,*
  315 U.S. 203 (1942) ........................................................................ 3, 13, 16, 17

*Verlinden B.V. v. Cent. Bank of Nigeria,*
  461 U.S. 480 (1983) ......................................................................................... 20

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
  576 U.S. 1 (2015) ............................................................................................... 4

**Constitutional Provisions**

U.S. Const. art. II, § 3 ............................................................................................. 4

**Statutes**

28 U.S.C. § 1330 .................................................................................................... 2

28 U.S.C. § 1491 .................................................................................................... 9

28 U.S.C. § 1604 .................................................................................................... 2

28 U.S.C. § 1605A .............................................................................................. 2, 19

34 U.S.C. § 20144 ................................................................................................ 10

28 U.S.C. § 1346 .................................................................................................... 9

Sudan Claims Resolution Act,
  Pub. L. No. 116-260, Division FF, Title XVII, 134 Stat. 1182, 3291 (2020) ................... *passim*

**Other Authorities**

*Certification Under Section 1704(a)(2) of the Sudan Claims Resolution Act Relating to the
Receipt of Funds for Settlement of Claims Against Sudan*,
86 Fed. Reg. 19080-01 (Apr. 12, 2021) ...................................................................................... 7

Claims Settlement Agreement,
Sudan-U.S., T.I.A.S. 21-209 ................................................................................... *passim*

**INTRODUCTION**

Under the Foreign Sovereign Immunities Act ("FSIA"), foreign sovereigns are generally immune from suit in federal court unless one of the FSIA's exceptions apply.  Plaintiffs filed this case against the Republic of Sudan under the FSIA's "terrorism" exception, which allows certain suits against foreign governments that have been designated state sponsors of terrorism. However, before Plaintiffs even served their complaint on Sudan, the United States and Sudan negotiated and executed a Claims Settlement Agreement ("CSA") as part of the process of developing and normalizing diplomatic relations between the two countries.  Under that Agreement, the United States espoused and terminated all claims of U.S. nationals against Sudan related to acts of terrorism occurring outside of the United States, including Plaintiffs' claims.  In exchange, Sudan agreed to pay $335 million to compensate plaintiffs in pending cases in which there had either been a default judgment entered against Sudan or a private settlement agreement reached between the plaintiffs and Sudan, or which related to incidents for which Sudan had already been found responsible in federal court.  Congress supported this diplomatic effort by passing the Sudan Claims Resolution Act ("SCRA"), which, upon enactment and receipt of the settlement funds by the United States, reinstated Sudan's sovereign immunity for terrorism-related claims and extinguished any private right of action against Sudan for such claims.

Plaintiffs do not dispute that the SCRA and the CSA mandate dismissal of their claims. Rather, Plaintiffs assert that they unconstitutionally violate Plaintiffs' rights to equal protection. Plaintiffs' principal theory is that they are "singled out" because their claims are espoused and terminated but not eligible for compensation from the CSA's $335 million settlement fund, while other ostensibly "similarly situated" parties either are eligible for compensation or retain their ability to prosecute their claims against Sudan.  However, as Plaintiffs concede, the SCRA and the CSA are subject only to rational basis review, and Plaintiffs ignore the obvious distinctions

1

between their claims and those of the other parties, which are more than sufficient to provide a rational basis for the SCRA and the CSA. Nor can Plaintiffs plausibly assert that the disposition of their claims denies them meaningful access to the courts, as Congress retains the right to alter a foreign nation's sovereign immunity, even if dispositive of pending claims.

Accordingly, Plaintiffs' constitutional challenge is meritless, and the SCRA and the CSA require dismissal of Plaintiffs' complaint.

## LEGAL BACKGROUND

### A.     The Foreign Sovereign Immunity Act

"Under the venerable principle of foreign sovereign immunity, foreign states are ordinarily 'immune from the jurisdiction of the courts of the United States and of the States." *Republic of Iraq v. Beaty*, 556 U.S. 848, 851 (2009) (quoting 28 U.S.C. § 1604). "The FSIA 'provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country' and renders a foreign government 'presumptively immune from the jurisdiction of the United States courts unless one of the Act's express exceptions to sovereign immunity applies.'" *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1317 n.1 (2016) (quoting *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 31 (2015)); *see also* 28 U.S.C. § 1330(a) (conferring jurisdiction over "any claim . . . with respect to which the foreign state is not entitled to immunity"); *id.* § 1604 (providing that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States" except pursuant to enumerated exceptions).

In relevant part, the FSIA recognizes a "terrorism" exception to the presumption of immunity, under which a U.S. national "may seek 'money damages . . . against a foreign state for personal injury or death that was caused by' acts of terrorism, including 'torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support' to terrorist activities." *Bank Markazi*, 136 S. Ct. at 1317 (quoting 28 U.S.C. § 1605A(a)(1)).

2

B.       The Doctrine of Espousal

As part of their controlling authority over foreign relations between the United States and

other sovereigns, "Congress and the President have, time and again, as exigencies arose,

exercised control over claims against foreign states . . . ."  *Bank Markazi*, 136 S. Ct. at 1328; *see*

*also Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003) (noting that practice of "[m]aking

executive agreements to settle claims of American nationals against foreign governments . . .

goes back over 200 years and has received congressional acquiescence throughout its history").

The principle of espousal—"the mechanism whereby one government adopts or 'espouses' and

settles the claim of its nationals against another government," *Antolok v. United States*, 873 F.2d

369, 375 (D.C. Cir. 1989)—is well-established as a matter of both international and domestic

law.  As then-Judge Scalia explained:

> [A] sovereign possesses the absolute power to assert the private claims of its
> nationals against another sovereign.  This authority to espouse claims does not
> depend on the consent of the private claimholder, and the fact that a claim has
> been espoused provides a complete defense for the defendant sovereign in any
> action by the private individual.  Once it has espoused a claim, the sovereign has
> wide-ranging discretion in disposing of it.  It may compromise it, seek to enforce
> it, or waive it entirely.

*Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1523 (D.C. Cir. 1984)

(Scalia, J.) (citations omitted).

The Supreme Court has upheld exercises of the espousal power as part of the President's

authority to establish diplomatic relations with foreign nations and to recognize foreign

sovereigns.  *See, e.g.*, *United States v. Pink*, 315 U.S. 203, 230 (1942) ("No . . . obstacle can be

placed in the way of rehabilitation of relations between this country and another nation, unless

the historical conception of the powers and responsibilities of the President in the conduct of

foreign affairs is to be drastically revised." (citation omitted)).[1]  In addition, the Court has also

upheld espousal outside of the recognition context, where "Congress has implicitly approved the

practice of claim settlement by executive agreement."  *Dames & Moore v. Regan*, 453 U.S. 654,

680-82 (1981).

## FACTUAL BACKGROUND

The United States established diplomatic relations with Sudan in 1956 after its

independence from joint administration by Egypt and the United Kingdom.  *See* Bureau of

African Affairs, Department of State, U.S. Relations with Sudan, Bilateral Fact Sheet (Jan. 12,

2021), https://perma.cc/ECT6-CM6T.  In 1989, then Brigadier General Omar al-Bashir seized

power in a coup, after which Sudan established links with international terrorist organizations.

*See id.*  In 1993, United States designated Sudan a state sponsor of terrorism.  *Id.*

For years, the United States and Sudan had hostile relations.  However, in April 2019, al-

Bashir was overthrown after a widespread popular uprising.  *Id.*  A Transitional Military Council

ruled the country until August 2019, when it agreed to cede power to a civilian-led transitional

government, which will govern Sudan through its democratic transition.  *Id.*  Since August 2019,

Sudan's transitional government has taken steps to restore friendly relations with the United

States.  For example, in December 2019, the United States and Sudan announced their intention

---

[1] The recognition power arises from the Constitution's assignment to the President of the power
to "receive Ambassadors and other public Ministers" from foreign countries, among other
Article II powers.  U.S. Const. art. II, § 3; *see also Zivotofsky ex rel. Zivotofsky v. Kerry*, 576
U.S. 1, 12-14 (2015) (discussing constitutional basis for President's recognition power).  The
power to receive ambassadors includes the power to decide which ambassadors to receive and,
thus, with which governments to establish diplomatic relations.  *See Guar. Trust Co. v. United
States*, 304 U.S. 126, 137-38 (1938) ("What government is to be regarded here as representative
of a foreign sovereign state is a political rather than a judicial question, and is to be determined
by the political department of the government. . . . Its action in recognizing a foreign government
and in receiving its diplomatic representatives is conclusive on all domestic courts . . . .").

to exchange Ambassadors, and the Sudanese Ambassador to the United States presented his credentials in September 2020.  *Id.*

In connection with these efforts, the United States and Sudan entered into negotiations to resolve pending lawsuits raised in U.S. courts against Sudan for terrorism-related conduct. These efforts culminated in the October 30, 2020 execution of the CSA.  *See* Claims Settlement Agreement, Sudan-U.S., T.I.A.S. 21-209 (attached as Ex. A).  The CSA acknowledges the two nations' shared goal of "further develop[ing] the relationship between their two countries . . . especially in light of Sudan's ongoing transition to democracy" and reflects the countries' agreement that Sudan must address certain pending terrorism-related claims "as part of its efforts to fully normalize relations with the United States."  *Id.* at 3-4.  The stated purpose of the CSA "is to reach a comprehensive settlement" that (i) espouses and disposes of the claims of U.S. nationals against Sudan relating to acts of terrorism "occurring outside of the United States;" (ii) "provides meaningful compensation" for "claims of foreign nationals" who were employees or contractors of the United States; and (iii) "bars and precludes" all terrorism-related claims against Sudan in U.S. courts through legislation restoring Sudan's sovereign immunity.  *Id.* at 5, Art. II(1)-(3).

In the CSA, Sudan agreed to pay $335 million to the Government to be distributed to parties in nine lawsuits, which arise from three acts of terrorism:  (i) the August 7, 1998 bombing of the U.S. embassies in Nairobi, Kenya and Dar es Salaam, Tanzania (the "Embassy Bombings"), (ii) the October 12, 2000 bombing of the U.S.S. Cole ("Cole Bombing"), and (iii) the January 1, 2008 killing of United States Agency for International Development employee John Granville.  *See id.* at 6, Art. III(1)-(2); *id.* at 10-11, Annex.  Specifically, the CSA provides that U.S. nationals in five identified cases whose claims were espoused under the CSA and/or

who had reached private settlements with Sudan are eligible for distributions from the settlement fund.[2]  *Id.* at 10.  The CSA also establishes a process to compensate eligible foreign nationals who already had been awarded damages in four identified cases arising from the Embassy Bombings.[3]  *Id.* at 10-11.  In exchange, the United States agreed to accept the $335 million payment as a "full and final settlement . . . through espousal" of all claims of U.S. nationals related to acts of terrorism occurring outside of the United States and to "release and finally discharge Sudan from all espoused claims."  *Id.* at 7-8, Art. IV(1), 2(d).

Congress supported the Executive Branch's efforts through the SCRA, which was enacted on December 27, 2020.  *See* Pub. L. No. 116-260, Division FF, Title XVII, 134 Stat. 1182, 3291 (2020).  The Act's "Sense of Congress" provision states that "the United States should support Sudan's democratic transition" and endorses "as part of the process of restoring normal relations between Sudan and the United States . . . efforts to provide meaningful compensation" to individuals who "personally have been awarded . . . a judgment for compensatory damages against Sudan" by a federal court.  SCRA § 1702(1)-(2).

Section 1704 of the Act authorizes the Secretary of State to certify to specified committees of Congress that Sudan's designation as a state sponsor of terrorism has been formally rescinded, that Sudan has made payments pursuant to private settlements of the claims of victims of the Cole Bombing, and that the Government has funds sufficient to cover the payment of a private settlement related to the death of Mr. Granville and compensation for

---

[2] The identified cases are: *Owens v. Republic of Sudan*, No. 01-cv-2244-JDB (D.D.C.); *Khaliq v. Republic of Sudan*, No. 10-cv-356-JDB (D.D.C.); *Taitt v. Islamic Republic of Iran*, No. 20-cv-1557-RC (D.D.C.); *Mwila v. Islamic Republic of Iran*, No. 08-cv-1377-JDB (D.D.C.); *Granville v. Republic of Sudan*, No. 2018-28 (P.C.A.).

[3] The identified cases are: *Wamai v. Republic of Sudan*, No. 08-cv-1349-JDB (D.D.C.); *Amduso v. Republic of Sudan*, No. 08-cv-1361-JDB (D.D.C.); *Onsongo v. Republic of Sudan*, No. 08-cv-1380-JDB (D.D.C.); *Opati v. Republic of Sudan*, No. 12-cv-1224-JDB (D.D.C.).

claims related to the Embassy Bombings. *Id.* § 1704(a)(2).  Upon the Secretary's certification—
which was made on March 20, 2021, *see Certification Under Section 1704(a)(2) of the Sudan
Claims Resolution Act Relating to the Receipt of Funds for Settlement of Claims Against Sudan*,
86 Fed. Reg. 19080-01, 19080 (Apr. 12, 2021)—the Act provides that Sudan and its agencies
and instrumentalities "shall not be subject" to the FSIA's terrorism exception to sovereign
immunity.  SCRA § 1704(a)(1)(A).  The Act further provides that "any . . . private right of action
relating to acts by a state sponsor of terrorism arising under Federal, State, or foreign law shall
not apply" against Sudan.  *Id.* § 1704(a)(1)(B).  In addition, the Act specifies that the restoration
of Sudan's sovereign immunity and the elimination of private rights of action for terrorism-
related claims apply "to all conduct and any event occurring before the date of the [Secretary's]
certification," regardless of its effect on "any action filed before, on, or after that date."  *Id.*
§ 1704(b).

The SCRA also appropriates $150 million to compensate individuals who "have been
awarded a judgment" in a case identified in section (c) of the CSA's Annex—*i.e.*, the *Wamai*,
*Amduso*, *Onsongo*, or *Opati* actions filed in this Court—and who are either (i) a Government
employee or contractor injured in the Embassy Bombings who became a U.S. citizen between
the date of the attacks and the date of the SCRA's enactment; (ii) a family member of a U.S.
national Government employee or contractor who is a U.S. citizen by the date of enactment; or
(iii) a family member of a foreign national Government employee or contractor killed in the
Embassy Bombings, who (the family member) is a U.S. citizen as of the date of enactment.  *Id.*
§ 1707(a)(1).

Finally, because the CSA only resolved claims related to acts of terrorism "occurring
outside of the United States," Ex. A at 5, Congress determined that "[n]either the [CSA], nor any

other aspect of the effort to normalize relations with Sudan . . . resolved claims against Sudan involving victims and family members of the September 11, 2001, terrorist attacks." SCRA § 1706(a)(2)(A).  Congress further recognized that the claims asserted in *In re Terrorist Attacks on September 11, 2001*, No. 03-mdl-1570 (S.D.N.Y.) were not espoused in the CSA and "remain pending." *Id.* § 1706(a)(3).  The SCRA accordingly provides that "[n]othing in this Act shall apply to . . . or otherwise affect" any claim in the *In re Terrorist Attacks* litigation.  *Id.* § 1706(c).

## PROCEDURAL BACKGROUND

Plaintiffs' claims arise from a 2016 attack against members of the Mark family allegedly perpetrated by Hamas in Hebron.  *See generally* Compl., ECF No. 1.  Plaintiffs are victims, family members of victims, and the estate of a family member of a victim of the attack.  They assert various tort claims against Sudan pursuant to the FSIA's terrorism exception, 28 U.S.C. § 1605A, on the theory that Sudan provided material support to Hamas.  All of the Plaintiffs are purportedly U.S. nationals.  *See* Pls.' Opp'n to Def.'s Mot. to Dismiss ("Pls.' Opp'n") at 3, ECF No. 20.

Plaintiffs filed their Complaint on October 20, 2020, *see* ECF No. 1, after the United States had reached an agreement in principle with Sudan.  Plaintiffs did not serve Sudan until March 9, 2021.  *See* ECF No. 12.  Sudan subsequently moved to dismiss the complaint, arguing, *inter alia*, that the Court lacks jurisdiction over Plaintiffs' claims because of the restoration of Sudan's sovereign immunity in the SCRA and that Plaintiffs fail to state a claim on which relief could be granted because the SCRA eliminated a private right of action relating to Sudan's prior status as a state sponsor of terrorism.  *See* Def.'s Mot. to Dismiss, ECF No. 16.  In their opposition to the motion to dismiss, Plaintiffs argue that the SCRA and the CSA violate Plaintiffs' equal protection rights and deny them meaningful access to the Courts.  *See* Pls.' Opp'n.  Concurrent with their opposition, Plaintiffs filed a notice of constitutional challenge

under Federal Rule of Civil Procedure 5.1.  *See* ECF No. 21.  The Court certified the challenge to

the Attorney General on July 9, 2021.  *See* ECF No. 25.

## ARGUMENT

## I.   PLAINTIFFS' CONSTITUTIONAL OBJECTIONS TO THE CSA AND THE SCRA ARE MERITLESS.

Plaintiffs do not dispute that the CSA espouses and terminates their claims or that the

SCRA restores Sudan's sovereign immunity with respect to those claims.  *See* Pls.' Opp'n at 7,

9.  Instead, they argue that because the CSA and the SCRA require dismissal of Plaintiffs'

claims, both the Act and the Agreement are unconstitutional.  *See id.* at 10-15.  Plaintiffs'

constitutional theories are meritless.[4]

i.  Plaintiffs' principal constitutional theory is that the CSA and the SCRA violate their

rights (and those of all other parties with potential claims against Sudan related to its alleged

material support for Hamas) under the Equal Protection component of the Fifth Amendment by

"singling out" their claims for disparate treatment.  *See* Pls.' Opp'n at 7-8, 13-14.  Specifically,

Plaintiffs argue that they are treated differently from other, supposedly similarly situated

plaintiffs with terrorism-related claims against Sudan because their claims are espoused and

terminated under the CSA but are not eligible for distributions from the $335 million settlement

fund or from the SCRA's additional appropriations for former foreign nationals.  *See id.* at 12-

13.  Further, Plaintiffs assert that they are treated differently from the plaintiffs in the *In re*

*Terrorist Attacks* multidistrict litigation because those plaintiffs did not have their claims

---

[4] Plaintiffs also suggest that the espousal and termination of their claims without "compensation or an alternative forum in which to present [their] claims" amounts to an unconstitutional taking in violation of the Fifth Amendment.  Pls.'Opp'n at 1, n.1.  That argument has no bearing on the Court's jurisdiction, as any takings claim must be properly raised against the United States, not Sudan, and in the United States Court of Federal Claims.  *See* 28 U.S.C. §§ 1346(a)(2), 1491(a)(1).

espoused and terminated in the CSA and the SCRA did not restore Sudan's sovereign immunity with respect to those claims. *See id.* at 11-12. In other words, Plaintiffs argue that, unlike all other terrorism-related claims against Sudan, their claims are both espoused and not entitled to any compensation. *See id.* at 13.[5]

As Plaintiffs concede, *see id.* at 14, their constitutional challenge to the SCRA and the CSA is subject to rational basis review. *See, e.g.*, *Hettinga v. United States*, 677 F.3d 471, 478 (D.C. Cir. 2012) (statutory classification that "neither proceeds along suspect lines nor infringes fundamental constitutional rights" is subject to rational basis review (citation omitted)); *see also Am. Bus. Ass'n v. Rogoff*, 649 F.3d 734, 741-42 (D.C. Cir. 2011) (claim that statute "singl[ed] out" certain parties for "special treatment" was "subject only to rational-basis review"). Under that standard, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). "Where there are plausible reasons for Congress' action," the Court's "inquiry is at an end." *Hettinga*, 677 F.3d at 478 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993)).

Plaintiffs bear "the burden 'to negative every conceivable basis which might support'" the challenged legislation. *Beach Commc'ns*, 508 U.S. at 315 (quoting *Lehnhausen v. Lake*

---

[5] Plaintiffs also complain that the SCRA provides "'lump sum' payments" to certain September 11, 2001 victims. *See id.* at 9. However, the relevant provision of the SCRA authorizes the Comptroller General to conduct an audit and publish a notice, subject to public comment, regarding catch-up payments to September 11, 2001 victims, spouses, and dependents to ensure parity in the percentage received from the United States Victims of State Sponsored Terrorism Fund between such parties and other family members of September 11, 2001 victims eligible for payments from the fund. *See* SCRA § 1705; *see also* 34 U.S.C. § 20144(d)(4)(C). Section 1705 of the SCRA does not itself provide for any additional payment, nor are payments made from the fund to these victims based on judgments against Sudan. Accordingly, this provision bears no relevance to Plaintiffs' constitutional challenge.

*Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).  Contrary to Plaintiffs' suggestion, Pls.' Opp'n at 13-14, Congress is not required to "articulate its reasons for enacting a statute," and "it is entirely irrelevant for constitutional purposes whether the conceived reasons for the challenged distinction actually motivated the legislature." *Beach Commc'ns*, 508 U.S. at 315.  Thus, the Court's analysis is not bound by "legislative facts" or any expressed "on the record" basis for the statutory distinction and, indeed, "may be based on rational speculation unsupported by evidence or empirical data." *Id.*

Here, the espousal and termination of Plaintiffs' claims and the restoration of Sudan's sovereign immunity were critical to the United States' interests in developing its relations with Sudan, supporting Sudan's democratic transition, and obtaining compensation for victims of the Embassy Bombings and the Cole Bombing.  *See* Ex. A at 3; SCRA § 1702(1)-(2).  Despite Plaintiffs' conclusory assertions to the contrary, their claims are fundamentally dissimilar from those that are potentially entitled to compensation under the CSA or the SCRA or those asserted in the *In re Terrorist Attacks* litigation.  *See* Def.'s Reply Mem. in Supp. of Mot. to Dismiss at 4-9, ECF No. 24.  The readily apparent distinctions between Plaintiffs' claims and those other claims demonstrate that the CSA and the SCRA have a legitimate basis for treating Plaintiffs' claims differently from those of other parties.[6]

*First*, the cases identified in the CSA and the SCRA as eligible for compensation all involve claims that have been resolved by a private settlement with Sudan or by the entry of a

---

[6] The identified distinctions between Plaintiffs' claims and those of other parties are not necessary criteria for the differential treatment of claims in claims settlement agreements. Rather, Congress and the Executive Branch, in furtherance of their duty to manage the foreign relations of the United States, must weigh the specifics of any outstanding claims, the particular circumstances of the relationship with the foreign sovereign, and the foreign policy objectives of the United States in determining how to address outstanding claims in the claims resolution context. *See infra* pp. 16-17.

default judgment or that relate to acts for which Sudan has already been found responsible by a federal court. The CSA provides for compensation to pay a private settlement in the *Granville v. Republic of Sudan* case in the Permanent Court of Arbitration. *See* Ex. A at 10, Annex. The CSA and the SCRA also provide for compensation to plaintiffs in cases related to the Embassy Bombings, in which the plaintiffs had either obtained a default judgment against Sudan and/or reached a private settlement with Sudan. *Id.* at 10-11; SCRA § 1707(a)(1)(A) (providing for compensation to individuals who "ha[ve] been awarded a judgment"); *see also Owens*, No. 01-cv-2244-JDB (D.D.C.), ECF No. 173; *Khaliq*, No. 10-cv-356-JDB (D.D.C.), ECF No. 18; *Mwila*, No. 08-cv-1377-JDB (D.D.C.), ECF No. 22; *Wamai*, No. 08-cv-1349-JDB (D.D.C.), ECF No. 34; *Amduso*, No. 08-cv-1361-JDB (D.D.C.), ECF No. 29; *Onsongo*, No. 08-cv-1380-JDB (D.D.C.), ECF No. 23; *Opati*, No. 12-cv-1224-JDB (D.D.C.), ECF No. 42. Not only have these cases reached a judgment, but Sudan in fact has been found responsible for the Embassy Bombings by this Court. *See, e.g.*, *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 143 (D.D.C. 2011) (finding that "evidence strongly supports the conclusion that Sudan harbored and provided sanctuary to terrorists and their operational and logistical supply network leading up to the 1998 terrorist attacks on U.S. embassies in East Africa"); *id.* at 146 (concluding that "Sudan's support thus facilitated and enabled the 1998 terrorist bombings on the two U.S. embassies in East Africa").

The CSA similarly provides for compensation to pay a private settlement in *Taitt v. Islamic Republic of Iran*, No. 20-cv-1557-RC (D.D.C.), which arises from the Cole Bombing, *see* Unopposed Mot. for Voluntary Dismissal, *Taitt*, ECF No. 12. And, as with the Embassy Bombings, federal courts—including this one—have previously found Sudan responsible for the Cole Bombing. *See Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 116 (D.D.C. 2015)

("Because the record supports a finding that the Iranian and Sudanese defendants conspired to support Al-Qaeda, which in turn carried out the bombing of the Cole, the Court concludes that all defendants shall be jointly and severally liable."); *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541, 554 (E.D. Va. 2007) (finding "by substantial evidence that Sudan's material support to Al Qaeda" resulted in Cole Bombing).

Plaintiffs' claims, of course, are in a different procedural posture from the claims eligible for compensation under the CSA and the SCRA.  Plaintiffs have obtained no judgment against Sudan, nor have they agreed to a private settlement with Sudan, and indeed, as discussed below, Plaintiffs only filed suit after the negotiations between the United States and Sudan regarding the settlement of claims had been publicized.  And though Plaintiffs imply that their claims are more factually supported than those arising from the Embassy Bombings and the Cole Bombing, *see* Pls.' Opp'n at 5-6, no federal court has yet found Sudan responsible for the attack against the Mark family.  It was reasonable, then, for the United States to conclude that seeking compensation for terrorism-related incidents for which parties had already obtained judgments against or settlement agreements with Sudan, as opposed to claims that were unresolved and far from any possible judgment, would further the United States' significant interest in normalizing its relations with Sudan.  *See Dames & Moore*, 453 U.S. at 679 (recognizing that "outstanding claims by nationals of one country against the government of another country are 'sources of friction' between the two sovereigns" and that "[t]o resolve these difficulties, nations have often entered into agreements settling the claims of their respective nationals" (quoting *Pink*, 315 U.S. at 225)).

*Second*, unlike the attack against the Mark family, the Embassy Bombings, the Cole Bombing, and the killing of John Granville all involved attacks on Government institutions,

employees, or both.  It is rational for the United States to prioritize compensation for claims related to what amount to attacks on the Government itself.

*Third*, Plaintiffs filed suit on October 20, 2020, long after the United States and Sudan had been negotiating and finalizing the CSA.  By the time the Complaint was filed, the existence of negotiations between the United States and Sudan—including the potential for an agreement to fund settlement payments—had been publicly reported.  *See, e.g.*, Lara Jakes, *U.S. Prepares to Take Sudan Off List of States that Support Terrorism*, N.Y. Times (Sept. 24, 2020), https://perma.cc/C6JE-497Y.  Indeed, by that time, the United States and Sudan had reached a settlement in principle.[7]  Moreover, Plaintiffs did not serve Sudan until March 2021, *see* ECF No. 12, well after the CSA was executed (October 30, 2020), the SCRA was enacted (December 27, 2020), or the CSA entered into force (February 9, 2021).  The United States could rationally seek to settle claims—and for Sudan to agree to settle claims—that were pending at the time the CSA was being negotiated, instead of pressing for compensation for claims brought only after the public became aware of the potential for settlement payments from Sudan.  Further, in light of this chronology, Plaintiffs cannot plausibly suggest that they had some reliance interest in the availability of the FSIA's terrorism-exception against Sudan.  *See Beaty*, 556 U.S. at 864-65 (foreign sovereign immunity "reflects current political realities and relationships" and "generally is not something on which parties can rely in shaping their primary conduct" (citation omitted)).

*Fourth*, Plaintiffs' claims are also differently situated from those in the *In re Terrorist Attacks on September 11, 2001* litigation, which the SCRA preserves.  Under the CSA, the United States agreed to espouse only claims of U.S. nationals related to acts of terrorism

---

[7] *See* E-mail from Christopher Curran to Andrew Keller (Oct. 4, 2020 7:37 PM), Informational Materials for Foreign Agent Registration Act Application of Christopher Curran, *available at* https://efile.fara.gov/docs/6393-Informational-Materials-20201006-2.pdf.

"occurring outside of the United States."  Ex. A at 5.  As a result, the *In re Terrorist Attacks* claims were never part of the settlement agreement between the United States and Sudan.  *See* SCRA § 1706(a)(2)(A) (recognizing that "[n]either the [CSA], nor any other aspect of the effort to normalize relations with Sudan . . . resolved claims against Sudan involving victims and family members of the September 11, 2001, terrorist attacks").  Thus, contrary to Plaintiffs' suggestion, *see* Pls.' Opp'n at 11, Congress's decision not to preclude the *In re Terrorist Attacks* litigation was not at cross-purposes with the CSA.

Moreover, Congress could reasonably distinguish between Plaintiffs' claims and claims arising from the September 11, 2001 attacks.  The latter relate to acts of terrorism that took place on U.S. soil and resulted in the largest number of fatalities ever within the United States at the hands of foreign terrorists.  In addition, litigation regarding those attacks had been ongoing for nearly two decades by the time the CSA was executed, whereas Plaintiffs only brought their claims against Sudan after the existence of negotiations between the United States and Sudan was made public.

Thus, the CSA and SCRA do not treat Plaintiffs' claims differently from similarly situated claims.  Rather, they treat Plaintiffs' claims differently because they are differently situated and because the United States determined that a settlement with Sudan on the terms agreed to in the CSA and implemented in the SCRA would further the United States' foreign policy objectives.  Plaintiffs' attempt to second-guess the specific choices made by the United States in negotiating and reaching an agreement with Sudan is irreconcilable with the rational basis standard, as well as with the broad latitude that courts grant the political branches in establishing and managing relation relations with foreign governments.

Congress and the President's authority to "exercise[] control over claims against foreign states" arises from their "controlling" authority over foreign relations, *Bank Markazi*, 136 S. Ct. at 1328-29, and the President's constitutional authority to recognize foreign states, *see Pink*, 315 U.S. at 230; *Garamendi*, 539 U.S. at 420 (recognizing that resolving claims of U.S. nationals "is a matter well within the Executive's responsibility for foreign affairs" because "claims remaining in the aftermath of hostilities may be 'sources of friction' acting as an 'impediment to resumption of friendly relations' between the countries involved" (quoting *Pink*, 315 U.S. at 225)). The political branches had the discretion to determine that the settlement of claims and restoration of Sudan's sovereign immunity would further the foreign policy objectives of the United States, including the normalization of relations between the United States and Sudan and the provision of support for Sudan's democratic transition. Ex. A at 3; SCRA § 1702(1)-(2). Incident to that discretion is the authority "to decide to whom the settlement funds would be distributed." *Aviation & Gen. Ins. Co. v. United States*, 882 F.3d 1088, 1095 (Fed Cir. 2018).

Plaintiffs' contention that they were singled out in the agreement is, put another way, simply an argument that they should have been included in the settlement with Sudan. But an argument that Plaintiffs "should have been included in the distribution of the settlement funds" ultimately "questions the President's *policy decision* to exclude them." *Id.* at 1095-96 (emphasis added). "[J]udicial inquiry into whether the President could have extracted a more favorable settlement would seriously interfere with the President's ability to conduct foreign relations." *Belk v. United States*, 858 F.2d 706, 710 (Fed. Cir. 1988); *see also Dames & Moore*, 453 U.S. at 679-80 (discussing President's discretionary authority to exercise control over claims of U.S. nationals against foreign sovereigns).

As the Supreme Court explained when upholding the President's espousal of U.S. nationals' claims against the Soviet Union when establishing diplomatic relations with that nation, the Government's authority to recognize foreign states "includes the power to determine the policy which is to govern the question of recognition." *Pink*, 315 U.S. at 229.

> No . . . obstacle can be placed in the way of rehabilitation of relations between this country and another nation, unless the historic conception of the powers and responsibilities of the President in the conduct of foreign affairs is to be drastically revised. It was the judgment of the political department that full recognition of the Soviet Government required the settlement of all outstanding problems including the claims of our nationals. Recognition and the [executive agreement] were interdependent. We would usurp the executive function if we held that that decision was not final and conclusive in the courts.

*Id.* at 230 (citation omitted). Any suggestion that the Executive Branch should have negotiated differently to provide compensation for Plaintiffs' claims, or not to reinstate Sudan's sovereign immunity for Plaintiffs' claims, is simply an invitation for the Court to usurp the political branches' authority to conduct foreign relations.

ii. As a fallback, Plaintiffs assert that the SCRA and CSA should be subject to strict scrutiny because they infringe upon Plaintiffs' fundamental right of access to the courts. Pls.' Opp'n at 14-15. This argument, too, is meritless.

As a threshold matter, it is unclear that Plaintiffs' fallback theory is in fact distinguishable from their "singling out" theory. Plaintiffs define the allegedly improper infringement as "any governmental interference with the constitutional right of access to the courts that *treats similarly situated individuals differently*." *Id.* at 14 (emphasis added); *see also id.* (describing violation as "unequal treatment of the Plaintiffs' claims"). But, as discussed above, Plaintiffs are not similarly situated to other parties whose claims are potentially eligible

17

for compensation or whose claims were not espoused.  By its own terms, then, Plaintiffs'

fallback theory does not establish an unconstitutional interference with access to the courts.[8]

In any event, the Supreme Court has recognized that Congress has the authority "to alter

a foreign state's immunity and to render the alteration dispositive of judicial proceedings in

progress." *Bank Markazi*, 136 S. Ct. at 1329.  Accordingly, Congress was well within its rights

to restore Sudan's sovereign immunity for Plaintiffs' pending claims, even though that alteration

disposed of Plaintiffs' claims.  *See id.* at 1328 ("[I]t is 'not for the courts to deny an immunity

which our government has seen fit to allow, or to allow an immunity on new grounds which the

government has not seen fit to recognize." (quoting *Republic of Mexico v. Hoffman*, 324 U.S. 30,

35 (1945)); *cf. Silver v. Silver*, 280 U.S. 117, 122 (1929) ("[T]he Constitution does not forbid the

creation of new rights or the abolition of old ones recognized by the common law, to attain a

possible legislative objective.").

Finally, the SCRA did not deny Plaintiffs access to the courts simply by restoring

Sudan's sovereign immunity.  If that were the case, then any party with a claim against a foreign

state that enjoys sovereign immunity under the FSIA could similarly argue that the FSIA has

unconstitutionally denied them access to the court.  That outcome would constitute a sea change

in the law and conflict with "the venerable principle of foreign sovereign immunity" under which

"foreign states are ordinarily immune from the jurisdiction of the courts of the United States and

of the States." *Beaty*, 556 U.S. at 851 (citation omitted).

---

[8] Plaintiffs also argue that the Government may not "grant the right [of access to the courts] and capriciously or arbitrarily deny it to others without violating the Equal Protection Clause." *Id.* at 14-15.  Again, that argument is conceptually indistinguishable from their "singling out" theory, which, for the reasons discussed above, fails.

18

**II.     THE CSA AND THE SCRA REQUIRE DISMISSAL OF PLAINTIFFS' CLAIMS.**

Because Plaintiffs' constitutional challenges to the SCRA and the CSA are baseless, the Court should dismiss Plaintiffs' claims for lack of jurisdiction.

*First*, the Court lacks jurisdiction because there is no longer a case or controversy that would permit the Court to proceed under Article III after the espousal and termination of Plaintiffs' claims in the CSA.  Plaintiffs concede, *see* Pls.' Opp'n at 1, as they must, that the President has the authority to espouse the claims of U.S. nationals.  *See, e.g.*, *Bank Markazi*, 136 S. Ct. at 1328.  Once he has espoused a claim, the President "has wide-ranging discretion in disposing it.  [He] may compromise it, seek to enforce it, or waive it." *Asociacion de Reclamantes*, 735 F.2d at 1523 (citing *Dames & Moore*, 453 U.S. at 680).  Under the CSA, the claims of U.S. nationals against Sudan, including Plaintiffs, have been espoused and released.  Ex. A at 8, Art. IV(2)(d)  Plaintiffs' legal interest in their claims against Sudan, therefore, has been extinguished.  Because Plaintiffs' claims no longer exist and Plaintiffs can no longer assert any legal interest in those claims, this suit no longer presents an actual case or controversy.  The Court, accordingly, lacks Article III jurisdiction.

*Second*, the Court lacks subject matter and personal jurisdiction over Sudan for the additional reason that Sudan is immune from suit under the FSIA.  The SCRA restores Sudan's sovereign immunity for claims arising under 28 U.S.C. § 1605A upon the Secretary of State's certification that the United States has received the requisite settlement payment and compensation from Sudan and that Sudan's designation as a state sponsor of terrorism has been rescinded.  *See* SCRA § 1704(a)(1); *id.* § 1704(a)(2).  As noted above, the Secretary of State submitted that certification on March 20, 2021.  The restoration of Sudan's sovereign immunity under the FSIA, therefore, deprives the Court of personal and subject matter jurisdiction over

19

Plaintiffs' claims.  *See Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 485 n.5 (1983) ("[I]f none of the exceptions to sovereign immunity set forth in the [FSIA] applies, the District Court lacks both statutory subject matter jurisdiction and personal jurisdiction.").

That Plaintiffs' claims predate the SCRA does not alter the effect of the restoration of sovereign immunity on those claims.  Congress has the "prerogative to alter a foreign state's immunity and to render the alteration dispositive of judicial proceedings in progress," *Bank Markazi*, 136 S. Ct. at 1329, and the SCRA expressly applies to "all conduct and any event" before the Secretary's certification, regardless of its effect on "any action filed before . . . that date," SCRA § 1704(b).  Thus, Congress has made clear its intent to restore Sudan's sovereign immunity and to have that immunity apply to all conduct before March 21, 2021, including with respect to pending claims.  *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994) ("When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach.").

*Third*, even if the Court had jurisdiction over Plaintiffs' claims, which it does not, those claims should still be dismissed because the SCRA expressly eliminates "any . . . private right of action relating to acts by a state sponsor of terrorism arising under Federal, State, or foreign law" against Sudan "in any action in a Federal or State court."  SCRA § 1704(a)(1)(B).  Because "a court should apply the law in effect at the time it renders its decision," *Landgraf*, 511 U.S. at 273 (citation omitted), Plaintiffs can no longer state a cause of action against Sudan.

## CONCLUSION

For the foregoing reasons, the Court should uphold the Constitutionality of the SCRA and the CSA and dismiss Plaintiffs' Complaint.

Dated:  August 30, 2021                    Respectfully submitted,

                                           BRIAN M. BOYNTON
                                           Acting Assistant Attorney General

                                           ANTHONY J. COPPOLINO
                                           Deputy Director
                                           Federal Programs Branch

                                            */s/ Chetan A. Patil*
                                           CHETAN A. PATIL
                                           DC Bar No. 999948
                                           Trial Attorney
                                           U.S. Department of Justice
                                           Civil Division, Federal Programs Branch
                                           P.O. Box No. 883
                                           Ben Franklin Station
                                           Washington, DC 20044
                                           Tel: (202) 305-4968
                                           Fax: (202) 616-8470
                                           Email: chetan.patil@usdoj.gov

                                           *Counsel for Intervenor the United States*

21