UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CHAVA RACHEL MARK,** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **REPUBLIC OF THE SUDAN,** <br><br> Defendant. | Case No. 1:20-cv-03022 (TNM) |

## MEMORANDUM OPINION

Plaintiffs sue the Republic of the Sudan. They seek compensation for its decades-long support for the terrorist group Hamas, whose operatives carried out an attack in Israel that brutalized their family. Sudan moves to dismiss based on its renewed immunity in U.S. courts. The United States intervenes in support of Sudan's position. The Court agrees dismissal is required.

### I.

In July 2016, operatives of the Hamas terrorist organization attacked members of the Mark family as they drove along an Israeli highway. Pls.' Compl. ("Compl.") ¶¶ 40, 64, ECF No. 1.[1] Of the 25 bullets fired into the family car, six struck Rabbi Michael Mark, killing him. *Id.* ¶ 65. The car careened off the road and overturned, but the other occupants survived, including Rabbi Mark's wife, Chava, who was shot in the head, and their daughter "TBM," who was shot in the stomach. *Id.* ¶¶ 67–71. The survivors suffer from permanent physical injuries.

---

[1] As it must at the motion to dismiss stage, the Court assumes as true all allegations appearing in the complaint.

*Id.* ¶¶ 119–21.  They also suffer from trauma and emotional injuries, as do a dozen other members of the Mark family.  *Id.* ¶¶ 122–23.

Plaintiffs are victims, family members of victims, and the estate of a family member of a victim (collectively, "the Marks").  They sue Sudan for providing material support and resources to Hamas that enabled it to execute the attack.  *Id.* ¶¶ 91–110.  Relying on their status as U.S. nationals and the "terrorism exception" to the Foreign Sovereign Immunities Act ("FSIA"), *see* 28 U.S.C. § 1605A, they seek punitive damages on top of $250,000,000 in compensatory damages.  Compl. at 20.[2]

Shortly after the Marks sued, the United States signed a bilateral claims-settlement agreement with the regime that now governs Sudan.  *See* Claims Settlement Agreement, U.S.-Sudan, Oct. 30, 2020, T.I.A.S. No. 21-209 (entered into force Feb. 9, 2021) ("CSA"), ECF 29-1.  Under the agreement, the United States espoused and terminated all claims by U.S. nationals against Sudan related to terrorist acts on foreign soil; in exchange, Sudan agreed to pay $335 million to compensate victims of specific attacks.[3]  *Id.*

The CSA coincided with a broader normalization of relations between the two countries: The United States rescinded Sudan's designation as a state sponsor of terrorism, and Congress agreed that Sudan's sovereign immunity would resume once the Secretary of State certified that certain conditions had been met, including Sudan's payment of the CSA settlement funds.  *See* Rescission of Determination Regarding Sudan, 85 Fed. Reg. 82,565 (Dec. 14, 2020); Sudan

---

[2]  All page citations refer to the pagination generated by the Court's CM/ECF system.

[3]  The CSA compensates parties in nine lawsuits arising from three terrorist incidents:  (1) the August 1998 bombings of U.S. embassies in Africa, (2) the October 2000 bombing of the U.S.S. Cole, and (3) the January 2008 murder of USAID employee John Granville.  CSA at 11–12, ECF No. 29-1.

Claims Resolution Act, Consolidated Appropriations Act, 2021, Pub. L. No. 116-260 (2020) ("SCRA").  Earlier this year, the Secretary certified that both countries discharged their obligations under the SCRA.  *See* Certification Under Section 1704(a)(2) of the Sudan Claims Resolution Act Relating to the Receipt of Funds for Settlement of Claims Against Sudan, 86 Fed. Reg. 19,080 (Apr. 12, 2021).

So Sudan now moves to dismiss under Rule 12(b)(1), (b)(2), and (b)(6).  *See* Def's Mot. to Dismiss ("Mot."), ECF No. 16.  Based on its restored sovereign immunity, Sudan asserts that the Court lacks subject matter jurisdiction and personal jurisdiction and that the Marks no longer have a private right of action.  *Id.* at 10–14.  The Marks contend that the CSA and SCRA violate their rights to equal protection under the law and ask the Court to declare them unconstitutional. Pls.' Opp'n to Mot. to Dismiss ("Opp'n") at 19, ECF No. 20.[4]  The Marks filed a notice of constitutional challenge under Federal Rule of Civil Procedure 5.1, *see* ECF No. 21, which the Court certified to the Attorney General, *see* ECF No. 25.

Intervening as of right, *see* 28 U.S.C. § 2403(a), the United States defends the constitutionality of the CSA and SCRA and supports dismissal, *see* U.S. Mem. of Law ("U.S. Mem."), ECF No. 30.  This matter is now ripe.

## II.

The FSIA is the "sole basis for obtaining jurisdiction over a foreign state" in U.S. courts. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).  Under

---

[4]  Although a plaintiff cannot typically amend his complaint through briefing, *see Singh v. District of Columbia*, 55 F. Supp. 3d 55, 70 (D.D.C. 2014), requiring the Marks to file an amended complaint here would not alter the analysis and would needlessly delay the case's resolution.  So the Court will address the constitutional challenge as the Marks advance it in the briefs.

the FSIA, a foreign state and its political subdivisions are presumptively immune from jurisdiction unless an exception applies. 28 U.S.C. §§ 1604–07; *see Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488–89 (1983). The FSIA creates an exception for claims alleging injury or death caused by state-supported terrorist acts under 28 U.S.C. § 1605A(a)(1), which also provides a private right of action.

A court must dismiss an action if it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3). When evaluating a motion to dismiss under Rule 12(b)(1), the Court must treat the complaint's factual allegations as true and afford the plaintiff the benefit of all inferences derivable from the facts alleged. *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 90 (D.D.C. 2018). But the Court need not accept unsupported inferences or legal conclusions couched as facts. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). Plaintiffs bear the burden of establishing jurisdiction by a preponderance of the evidence. *Erwin-Simpson v. AirAsia Berhad*, 375 F. Supp. 3d 8, 12 (D.D.C. 2019).

To defeat a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), plaintiffs must make a prima facie showing that the Court has personal jurisdiction over each defendant. *Id.* In doing so, they must provide factual support beyond mere conclusory assertions. *Id.* The Court can consider materials outside the pleadings in determining its jurisdiction, *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005), including undisputed facts in the record or disputed facts that it resolves, *see Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).[5]

---

[5] Because it lacks jurisdiction, the Court does not address Sudan's motion to dismiss for failure to state a claim under Rule 12(b)(6). *See* Mot. at 13–14.

### III.

### A.

The Marks never contest that, as enacted, the CSA terminates their claims or that the SCRA restores Sudan's sovereign immunity for those claims. *See* Opp'n at 11–13. And that much is clear from the text of the legislation: Sudan "shall not be subject to the exceptions to immunity from jurisdiction . . . under section 1605(a)(7) (as such section was in effect on January 27, 2008) or section 1605A . . . ." SCRA § 1704(a)(1)(A); *see also* CSA, Art. IV(2)(d) (explaining that United States "[s]hall release and finally discharge Sudan from all espoused U.S. national claims" as further specified).

Rather, the Marks contend that the CSA and SCRA violate their constitutional rights. Opp'n at 10–19. They protest that their claims are arbitrarily treated differently than other terrorism-related claims against Sudan that are terminated under the CSA but eligible for distributions from the $335 million settlement fund or funds set aside in the SCRA. *Id.* at 16–17. They also point to an implicit carve out in the CSA and SCRA for an ongoing multidistrict lawsuit related to the September 11 terrorist attacks; Congress did not restore Sudan's sovereign immunity for that litigation, so it proceeds against Sudan. *Id.* The Marks cry foul at being left out of the mix, and they characterize the disparate treatment as an equal protection violation. *Id.* at 17–18.

Of course, not all differences amount to invidious discrimination. But the Marks assert that any differences between the compensated claimants and themselves are arbitrary, as the CSA "provides no standards that determine which claimants receive payment under the CSA and which claimants do not." *Id.* at 16.

All parties agree the rational basis standard governs the Marks' equal protection claim. *See* Opp'n at 15; Def's Reply Mem. ("Reply") at 9, ECF No. 24; U.S. Mem. at 15; *see also Am. Bus Ass'n v. Rogoff*, 649 F.3d 734, 741–42 (D.C. Cir. 2011) (noting that claim that statute "violates equal protection by singling out" certain parties "for special treatment is subject only to rational-basis review"). Under that standard, the legislation is presumed valid and the Marks "have the burden to negative every conceivable basis which might support it." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (cleaned up). Contrary to the Marks' suggestion, *see* Opp'n at 17, courts "never require a legislature to articulate its reasons for enacting a statute," so "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Beach Commc'ns*, 508 U.S. at 315.

The Marks fail to negate every conceivable justification and thus do not meet their burden. *See id*. Sudan advances a few unrebutted rationales. Reply at 10–15. More still, the United States as intervenor offers several justifications—each conceivable and each unrefuted by the Marks. *See* U.S. Mem. at 16–20.

*First*, the matters identified in the CSA as eligible for compensation all involved claims in which Sudan's liability was already resolved by the date of the settlement, either through default judgment or private settlement. U.S. Mem. at 16–19. In contrast, when the Marks filed this case in October 2020, Sudan and the United States were in the final stages of negotiating their settlement. And Sudan was not served until March 2021—after the agreements were in force. *See* ECF No. 12. Even as of today, no judicial ruling or settlement has established Sudan's liability in the Hamas attack on the Mark family. It is understandable, then, that claims relating to that attack—and any number of other unknown or yet-unlitigated incidents—are not

covered by the agreements executed last fall.[6]  That the agreements limited Sudan's liability to claims where it was already on the hook was rational.

More, when government decisionmakers must draw a line for benefits or burdens *somewhere*, courts must be especially hesitant to second-guess where that line falls.  *See Beach Commc'ns*, 508 U.S. at 315–16 ("Defining a class of persons" for benefits or burdens "inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line . . . ." (cleaned up)).  And after all, the settlement resulted from a compromise.  The Court may assume that the line fell where it did as a result of the push and pull of negotiation.

*Second*, unlike the attack on the Mark family, the incidents eligible under the CSA for compensation all involved attacks against United States property, its employees, or both.  *See* U.S. Mem. at 18–19.  It is understandable for the United States to prioritize compensation for attacks targeting itself rather than merely its nationals.  This explanation blunts the Marks' argument that the CSA lacks any "standards that determine which claimants receive payment" and thus awards benefits arbitrarily.  Opp'n at 16.

The wisdom of the distinction is beside the point.  It need only be rationally related to a legitimate governmental interest.  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).  And it is:  The United States has a legitimate interest in cultivating relations with foreign nations as well as securing compensation for its aggrieved nationals.  *See generally Dames & Moore v. Regan*, 453 U.S. 654, 679–88 (1981).  The classifications implicitly created by the

---

[6]  Indeed, for all the Court knows, the settlement did not cover the attack on the Mark family simply because U.S. negotiators did not know about it to include it.

claims settlement are neither at odds with nor "clearly irrelevant" to the stated goals of the CSA and SCRA of repairing the countries' relationship. *USDA v. Moreno*, 413 U.S. 528, 534 (1973).

*Third*, the claims related to September 11 are unique. Those claims were not espoused and terminated in the CSA and remain pending against Sudan. *See* SCRA § 1706(a)(2)(A). The Marks think this "disparate treatment" is also capricious, saying it "bears no rational relation" to the United States' goals in settling claims against Sudan. Opp'n at 15. But the September 11 claims are not similarly situated to the Marks' claims or those compensated by the settlement. Unlike all the other claims, they concern a terrorist attack on U.S. soil. The United States could rationally carve out this high-profile tragedy with thousands of American casualties as sui generis. And here again, that litigation with hundreds of defendants had been ongoing for nearly two decades by the date of the settlement, unlike the Marks' eleventh-hour claims filed in October 2020. *See In re Terrorist Attacks on Sept. 11, 2001*, No. 03-mdl-01570 (S.D.N.Y.).

Lastly, a word about the context. Even if it had reason to second-guess the Government's judgment here, the Court would not given the broad latitude the Constitution grants the political branches to manage the nation's foreign relations. *See, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420 (2003) (terminating "claims that may be held by residents of this country is a matter well within the Executive's responsibility for foreign affairs" because unresolved claims "may be sources of friction acting as an impediment to resumption of friendly relations" (cleaned up)).

With the power to settle claims comes the power to settle them imperfectly. The Marks essentially ask for the Court to rule that the executive branch should have negotiated better. This it will not and cannot do. *See Belk v. United States*, 858 F.2d 706, 710 (Fed. Cir. 1988) ("[J]udicial inquiry into whether the President could have extracted a more favorable settlement

8

would seriously interfere with the President's ability to conduct foreign relations."). Nor can the Court assume that incorporating the Marks' claims in the settlement would come at no cost to equal or greater national priorities. Minding the separation of powers integral to our government, the Court declines to second-guess the political branches' wisdom here.

**B.**

In the alternative, the Marks assert that the Court should actually apply strict scrutiny in analyzing the CSA and SCRA because together they infringe on the Marks' fundamental right to access the courts. Opp'n at 18–19. This contention lacks merit. Congress's authority to limit the jurisdiction it has bestowed on federal courts is well established. *See Patchak v. Zinke*, 138 S. Ct. 897, 907 (2018). No less so for foreign sovereign immunity, as it is "Congress' prerogative to alter a foreign state's immunity and to render the alteration dispositive of judicial proceedings in progress." *Bank Markazi v. Peterson*, 578 U.S. 212, 236 (2016). And the executive's ability to settle or terminate even private claims in the nation's interest is clear. *Garamendi*, 539 U.S. at 420. None of these routine, constitutionally prescribed actions generally bar the Marks from accessing the courts to seek justice.

More, the Marks fail to invoke the elements of a proper denial-of-access claim. *See Broudy v. Mather*, 460 F.3d 106, 117–18 (D.C. Cir. 2006). So their arguments understandably look very different than those that have prevailed in prior cases. *See Christopher v. Harbury*, 536 U.S. 403, 412, 413–14 (2002) (collecting cases). The Marks are not the victims of misconduct by government actors whom they now sue for blocking their access to legal relief. *See id; cf. Sousa v. Marquez*, 702 F.3d 124, 128 (2d Cir. 2012) ("backward-looking right of access" claims "would be available only if the governmental action caused the plaintiff's suit to

be dismissed as untimely or if official misconduct was so severe as to render hollow his right to seek redress" (cleaned up)).

Nor are the Marks in the same shoes as indigent or imprisoned plaintiffs who are hindered by fees or regulations imposed by the Government. *See Christopher*, 536 U.S. at 413–14. They are still free to enter court and sue any other defendant or for any other reason. After all, the Marks proceed before this very Court against the Islamic Republic of Iran on identical claims related to the Hamas attack. *See Mark v. Islamic Republic of Iran*, No. 20-cv-00651 (D.D.C.).

That the political branches changed the rules inside the courthouse does not mean that they have blocked the courthouse doors. Because the CSA and SCRA do not infringe on any right to access the courts, strict scrutiny is unwarranted.

\*     \*     \*

Having determined that the CSA and SCRA survive constitutional challenge, the Court returns to its jurisdiction. The visit is brief.

No party disputes that the Secretary of State certified that the countries discharged their duties under the SCRA, so Sudan's sovereign immunity is restored. The terrorism exception to the FSIA was the sole basis for jurisdiction, so the Court now lacks personal and subject matter jurisdiction over Sudan. *See Verlinden*, 461 U.S. at 485 n.5. The Court must dismiss the case. *Accord Clay v. Socialist People's Libyan Arab Jamahiriya*, 614 F. Supp. 2d 21, 25 (D.D.C. 2009) (dismissing claims against Libya under FSIA § 1605A after Libyan Claims Resolution Act terminated terrorism-related claims and restored sovereign immunity).

## IV.

For these reasons, the Court will grant the motion and dismiss the case with prejudice. A separate Order will issue.

Dated: October 7, 2021                                    TREVOR N. McFADDEN, U.S.D.J.